And we'll go to McNeill v. United States. He's in charge of the public session. We noted your presence, Mr. Neal. We thought you wouldn't give up, nor do you. I would like to reserve two minutes, please. That's granted. This matter has two basic issues that I suggest merit a reversal. The first one has to be, why didn't they get a search warrant? The first one is that there was no reasonable basis to go into the room and, in effect, search the room without a search warrant. Now, this circuit has addressed... They were arguing exigent circumstances. Right. This circuit has addressed, in four different cases, exigent circumstances where domestic violence was the underlying, I'll call it, etiology. I guess the question here is, obviously, there's a lot of blood here when they come down. And so, don't they have a right... Maybe you would say all they can do is knock on the door, but don't they have a right at least to look in the room to make sure no one else is in there? This was nasty stuff. The 911 call doesn't come from the room. It comes from the manager of the hotel. The occupants of the room are already out of the room. Well, do they know that? They have a full and fair... I'm sorry if I cut you off. The then known occupants, we're saying. They have a full and fair opportunity by segregating Mr. McNeil from Ms. Sanchez, which is the protocol in dealing with a domestic violence investigation. Ms. Sanchez is interrogated by one officer. Mr. McNeil is interrogated by another officer. Doesn't he take off? Well, he doesn't take off immediately. He stays there. And they complete the initial investigation. And they interview Ms. Sanchez. They interview Waylon, the hotel manager. They interview Mr. McNeil. Ms. Sanchez, at that point, is taken... EMT people are there. They deal with, on an emergency basis, the laceration through her head. They place her into the EMT vehicle. By that time, she has been completely interviewed as to what happened, what the immediacy is of the circumstances of the event. But do they please know that there's no one else in the room? I'm sorry? Do they know that there's no one else in the room? Well, they never make any inquiry. And there is no utterance by either of the two protagonists. Weren't they both asked if there was anyone in the room? And they said no? Well, they... Am I wrong? Actually, they do. The officer, Templowski, and I think Tomko was the other officer. There is some discussion as to, is there anyone else in the room? Their answer is, no, there was no one. We were there. Well, didn't Mr. McNeil not answer that question? I don't recall him answering the question. I think that was directed to Ms. Sanchez as to whether or not there was anyone else there. And I thought the police, the government position is that because he didn't answer the question, they didn't know whether there was anyone else in the room. Is that... Am I wrong? Well, what happens... I mean, I can be wrong. My colleagues tell me I have a lot of time. Only in private. The officer starts to direct Mr. McNeil through the area. The building is a large rectangle with an internal courtyard. There is a walkway to enter into the back area. They're walking through that area, and Mr. McNeil is being directed back through. He's walking ahead of the officer. At that point, he doesn't have... They ask him for a key. He doesn't have a key, an electronic entry device. And while going back, that's when Mr. McNeil runs from the area. That's not a good sign. Well, would I be in a much better position to argue something else if I didn't have that to deal with? Absolutely. But his leaving the area certainly... Isn't part of the problem that we have here, just fast-forwarding just a little bit, that the district court found the officer's testimony to be credible? And maybe you're skeptical, and maybe even we're skeptical at certain points, but how do we overturn a credibility determination? What I suggest you do is we have to look at what were the objective events that were confronting the police officer at the time they decided to enter the room. And they were... And I suggest, and perhaps it's cynicism on my part, but I think it's cynicism well-earned from dealing with these narcotics officers. You have a lieutenant of the narcotics squad who's there. Immediately after, you have five narcotics officers who are there on a domestic violence. They get in the room, neither Mr. Whalen, the manager, nor Miss Steck, the person who runs the maze, each of whom have the electronic cards, say, we didn't give the officers these cards. They don't knock at the door and say, is anyone there? They just invade what is his home. Mr. DeGroote? Yes. I'm sure you'll go on to talk about the way the search was conducted and whether the lieutenant's testimony is reliable and so forth. But up to the point of whether it was appropriate for the officers to enter the room, for myself, I would need a good deal of persuading that that was inappropriate activity in a scenario in which Judge Slobiter said she thought the record showed that the inquiry had been made to McNeil. Is there anybody else in the room? And it was asked more than once, and there was no answer. And I think that is what the record shows. If that is the scenario, that's certainly the government's recital, and with record references, I don't have them here. If that's the case, I should think an officer would be almost delinquent not to go into the room to see if he wasn't going to get any information from the tenant. And there was blood all around. But if there was at least an attempt at a less invasive method first, knock on the door. There was an inquiry with Mr. Whalen first, the manager, who's there? He said McNeil was there, and he said that the bill was paid by a young woman, the woman who had the injury. Let's suppose the less invasive. I'm the officer, and I knock on the door, and there's no answer. So I should infer from that that there's nobody inside and not go in. Well, under the cases that this circuit has already decided, when the victim is not there anymore, the victim has been removed. They can't go in. That takes us to the question that Judge Ambrose asked, I think, to start with. How are the officers to know how many victims there are at that point? They had the inquiry of dealing with Ms. Sanchez, and Mr. McNeil was there responding to questions before they asked him about his name. They asked him for his license. He produced things from his person. It wasn't an immediate claim. Put yourself in the officer's mind for a moment. They ask him a question about, is anybody in the room? Do not get an answer. Subsequently, he runs. You can imagine the officer saying, boy, if I don't go in that room or at least check to see if someone's there, and there is, it's my career. Well, I disagree. I suggest that those kinds of issues that have already been decided, that they have to do something. There has to be some reasonable inquiry without invading the room before they can do that. What would you have done if you were an officer in that situation, when you don't get an answer from Mr. McNeil? Knock on the door and see if there was anyone there. And if there's no answer, then what would you do? And then just listen. If there's no sound, then one may reasonably conclude that there's no one there anymore. Or unconscious. Would you send in a maid? Would you send in a manager? If the room had a right to go into the room, certainly could do so. But this officer, under what he did, invaded my client's home, without probable cause to do so. You can imagine a police officer, if he would send in a maid or the manager and there was somebody in there who had a gun, that would be another career ender, I guess. That may be. But I still am not retracting that under the existing cases and under the facts here, that those officers had any right to go in. Once they're in, there is a substantial difference between looking in a room that doesn't have any barriers and seeing that there is no one there, and closing the door. Once they're in, searching everything the way that they searched. That strikes me as a more fruitful line for you to pursue. Yes. I see my time is running out. I would like to address the issues concerning the use of the government's proofs with regard to the use of the gun in furtherance of. Now, I suggest that these cases, Sparrow is the controlling law clearly, and Sparrow directs itself to a set of circumstances where a gun was found wrapped in floorboards, but there had been surveillance and a whole number of hand-to-hand narcotic transfers made in the location, in the bodega where Sparrow was operating and where the search warrant was executed. In this instance. I grant you Sparrow is a very different set of facts.  Sparrow is a different set of facts. But also, as to the search of the Explorer, Mr. McNeil was in custody for at least 18 months prior to the search of the Ford. It's extremely significant there because that's what tacks on 25 years to his sentence. Now, the automobile is searched. The automobile is in the possession of a third party. It's owned by Mr. McNeil's father. So, my client, you know, he doesn't have keys. Well, he was known to have used it or had access to it. Isn't that right? There was testimony to that. Ms. Sanchez says that in addition to riding with him in the Ford Taurus, she was in a white Ford Explorer. Presumably, it's the same Ford Explorer, although, you know, we don't have any testimony. But, you know, and I can see that there were documents of Mr. McNeil in the Ford Explorer. And the drugs were in a compartment that was hidden. Right. There were 10, according to the testimony of Agent Crow, there were 10 bags of heroin found in there. Okay. And so they weren't exactly in plain view. So, he knew where they were and he could have, assuming he could get access, could have gotten them. Is there any indication that the father used? I thought there was some indication the father didn't use that. There was no testimony whatsoever concerning the automobile. There was testimony by Ms. Sanchez saying that he used a white Explorer. There was the search of the Explorer wherein some mortgage documents were found in the car. Whose documents were they? They belonged to my client. Ah, so then your client did exercise or have some connection with the car, right? Well, his documents were present and I suggest that that's not the amnesia of control. He didn't put it there. Clearly, he has been in custody. He didn't have keys at the time his home was searched in addition to. But he had had keys at one point, hadn't he? Well, if we accept with Leslie Sanchez and make the jump that that is indeed the same car, he used it. But what has to be addressed is whether or not under the circumstances a jury could have reasonably found that there was a gun used in furtherance of distribution of these 10 bags of heroin. And I suggest that if we use the analysis of the attendant circumstances test, it clearly isn't there. I mean, he's not there. The only testimony about the Ford Explorer is Leslie Sanchez. Leslie Sanchez doesn't, she doesn't, I went to the movies with him in this car. He opened the trap once and showed me, you know, and I saw a handgun in it. It doesn't, her testimony was not, I went somewhere and saw him distribute drugs. And I saw him put the gun, you know, in his waistband while he was selling drugs, which I suggest would be at least some basis to make that kind of a finding by a jury. This record was devoid of anything to show that the specific intent necessary with regard to that gun was proven by the United States. And if we look at the gun in the room, in the hotel room, the gun there, there is no proof that that gun was being utilized specifically to further the distribution of the drugs. The statute says the mere presence of a gun in and around drugs does not give rise to a conviction. There has to be other adequate attendant circumstances which prove the state of mind necessary. Thank you. May it please the court, my name is Caroline Sadlewski and I represent the United States of America. I'd like to first address the first issue of suppression and discuss exactly the record sites where we learned that there was no answer by the defendant or his girlfriend about whether anyone was in the room. At our supplemental appendix, page 34, the officer described Sanchez's state of mind, that she was hysterical and unable to answer any question. And McNeil did not answer the officer's questions asking of him about who was in the room as recorded at defendant's appendix, page 127. You argue there's exigent circumstances for them to go into the room, but is there something short of them going into the room, guns drawn, etc., that could have been done here to find out if there was another person in the room? Your Honor, they were concerned that if someone were injured, and it's reasonable for them to assume that person could have been so significantly injured that they could not answer the door or make themselves known to the officers knocking on the door, and the Supreme Court case Richards, 520 U.S. 394, indicates that in circumstances like that, they need not wait and knock at the door even. They can enter the room. Once they went in, how big was the room? My understanding of the room is it was sort of an efficiency apartment with a kitchen and dining area and bedroom and separate bathroom and closet. And my understanding of the testimony at the suppression hearing is that the search only took one minute. That was what the Templowski said, a minute or two, but didn't Evans say 15 to 20 minutes? My understanding is that testimony emerged at the trial, and no one at that time raised the issue for the district court or suggested that that was conflicting testimony. But it does give some indication that maybe somebody's making something up here. The difference between one or two minutes and 15 to 20 minutes is a lot. In 15 to 20 minutes, you could do a complete sweep of the house of the efficiency. You're right. One other thing that the district court noted at the suppression hearing was that the police dispatch recordings indicated the same thing that the officer testified to, that they went into the room, they saw signs of a struggle, blood and other things, and they went in because they were concerned about a victim. They indicated that in the dispatch records. But they saw something else, and they knew they needed to go get a warrant. Yeah, but how do we? This is the second case this week that we've had, that James Rowe and I, not Pauline, in which New Jersey police just didn't get a warrant. And you argue now exigent circumstances. And you did on Monday or Tuesday, whatever day we have, those happen. If we sustain your position and affirm, how do we get across to the police the need, and of course they're not the federal police here, the need to get a search warrant? It doesn't take a long time. I have magistrate judges talking to the class that I teach, and they pick up the phone and they call the magistrate judge and they say what is going on. And the magistrate judge can give them an oral okay, and then they physically get the search warrant. I don't understand. And then you come in and you try to wash it all away. How do we get that point across? That's an important provision of the Constitution. If we affirm here, how do we do that? I appreciate that the court is very concerned about the warrant requirement for searches of people's rooms. I think also the court has already observed an argument that these officers were faced with a situation where they didn't know what had happened yet, and they had a hysterical person and a fleeing defendant and a very bloody scene, and they were charged with prudency. Wait a minute, how soon did he flee? Didn't he flee after they went up to search the room? What is the time sequence? The officer asked him some basic questions which he declined to answer about his identity and then whether someone was in the room. And when he further refused to answer that, they said why don't we go see, and as they started to walk back to the room, he fled relatively quickly. He wasn't in the room, he wasn't dangerous. What did they think was in the room? Another victim who never cried out or anything? She said there was no one else in the room. Well, she didn't actually say that there was no one else in the room. She did say initially, apparently, that she fell and hit her head on a table, but she didn't. She wasn't able to respond to.  Right, and the officers observed that in their experience with domestic violence cases, this didn't make sense. And moreover, these people didn't stay in the hotel room where you normally would stay if you were seeking medical assistance and you were hurt in an ordinary way. They asked for the police not to come, just for an ambulance. And so it seems like this was evasion from the beginning, and she was so seriously injured that the police had reason to disbelieve her story. And because they couldn't get any answer and there was a fleeing defendant, they really are thrown back on their own judgment at this point. And perhaps the legally conservative... They entered the room after he fled? Is that your testimony? Yes, they did, after he fled. Am I indulging undue skepticism when I say that I find the lieutenant's testimony as to how quickly he went through the room and how much he observed during that time period, put then in the context of the subsequent testimony by Officer Evans, that that initial search took 10 or 15 times as long? Am I being unduly skeptical in thinking that the lieutenant's testimony is pretty hard to credit? Your Honor, it's interesting to observe that, for instance, Judge Bassler, after listening to the day of testimony by all the officers and the police dispatcher records, observed that if these officers really had wanted to manufacture a case, they would have testified that they saw the gun on top of the television, that everything was much more obvious than it was. And their testimony is fairly credible in that they say they just saw drug packaging material and some white powder, and then inside the closet they saw these folds of heroin. They didn't mention the fact that there was a gun in the room or this larger packet of drugs at all. That didn't come out until the later search, so that if they really had been thoroughly searching, there wasn't much in the room besides the backpack and the other box in the closet. They certainly might have come across the gun and the larger packet of drugs in the backpack or the ammunition, and there's no mention of any of the drugs or the large amounts of ammunition or the gun in the backpack until subsequent. Officer Evans' testimony is to be disbelieved? Well, I think Evans may be misremembering, or there were a few searches of the room at that point, and to him it may not seem very significant at the time. But what is to me, 15 to 20 minutes, as I said, is a really long time. I think it is a really long time. And so back to the beginning of Judge Pollack's question, they go in the room, they're checking to see if there's victims. That takes almost no time and inefficiency, I mean, less than 30 seconds. And yet they say they see something, and then they see something else, and they see something else. I mean, I guess it was just all in plain view? Yes, Your Honor. All of it? It was all in plain view except for the contents of the backpack, which there's no evidence that they saw before that. But the contents of the closet, it's reasonable both to have opened the closet and looked in it if you're looking for a victim. And the officer's testimony was that the closet door was open enough that he could see this box inside with the folds, 1,400 folds. But there's no victim inside the box, right? Yeah, right. The box is open, though, in the closet. I thought it was partially open. I think they said the lid was knocked backwards. It was sort of an attached lid. I mean, 20 minutes is also perhaps reflective of the fact that, you know, the officers were walking through the room all together. I mean, I think they had a very heightened sense of danger. Their guns were drawn as they were approaching the room. They had no reason to believe there wasn't any other assailant involved. Yeah. And so, you know, the fact that they might have been double-checking themselves a couple times as they were involved in this surprising situation makes sense. There's one other matter of the record I wanted to address. The Explorer, there is testimony in the record that Ms. Sanchez testified that she looked at pictures of the inside of the Explorer, and that was what she saw, both the trap open and closed. And so I think it reflects that this was the car and the trap that the defendant was driving. And the indictment includes the time period before, on or about the time period that he was arrested, so before he was in jail and in control of the contents of this vehicle. We shouldn't be worried about the lapse of time between the defendants being in custody and the discovery of the gun, which added, what, how many years to his sentence? Twenty-five. A significant amount to his sentence. Yeah. Yeah. Well, the indictment includes the time period before he was in jail, and there's no evidence that anyone else had any control over this trap in the car. He was the only person. How did they find out 18 months later about the car? Through interviewing Ms. Sanchez, a change of agent in the case. The new agent went out to interview Ms. Sanchez and learned about her experience. And they got a warrant for that? Yes, sir. They did not? There was no warrant. I apologize. You're not on the tape. That was my fault. That was my fault. Yeah. Thank you. Do you have any more questions? Thank you. Thank you. Excuse me. Could you come back here? Yeah. Did I miss you? What about your inevitable, don't you have an inevitable discovery? Did you discuss that? No. The independent source doctrine, Your Honor? Well, you call it an independent source doctrine. Who was the independent source? Your Honor, because they had probable cause to enter the room and because they addressed the magistrate, they put that evidence before him as well as the evidence of the drugs. That evidence alone would have been absent the evidence of the drugs. Yeah, but the evidence of the drugs came about because they entered the room. So if they could have entered the room, then you don't need this inevitable, this independent source. I really thought you meant inevitable. My notes say you really meant inevitable discovery, but that's not what you meant. You meant, how do you have an independent source if you get the drugs from the entry into the room, which is what is being challenged? My understanding of the independent source doctrine is that if you, if the events occurred that would have allowed you to get a warrant anyway, disregarding whatever you learned through the entry to the room, and they did occur, they went to the judge with this information, they would have given them that, as opposed to if... No, no, that makes sense. But I don't know that that would be an independent... Well, it seems to me that that's an inevitable discovery doctrine, that if they had done that which they were supposed to do, i.e. get a warrant, then they would have gone into the room and they would have found the drugs. Isn't that right? I think the phrase is intelligent design. That's in the Middle District, not in New Jersey. My only other thought on inevitable discovery would be if a totally separate procedure was set in motion whereby they would have come across this evidence, and that would be inevitable discovery. But Your Honor, I mean, I was certainly looking at Harold several times to try to distinguish on the back of this case. Okay, I just wanted to make sure that... Whatever you need to win is what you're saying. Let's hear Mr. DeGruy. I would ask that you look at the 9-1-1 tape and the transcript as somewhat of an arbiter of what the police were doing and what they spontaneously uttered amongst themselves and to themselves when they really didn't think that they were being recorded. What was that? What would we find if we looked at that? If you did, you would find at 6 o'clock, Officer Angel Padilla, who was in the hospital taking a statement from Ms. Sanchez. He's speaking to, I think he says Tom Coe or Evans, and they're talking about a kilogram, a kilogram and a half of heroin, which by coincidence is the same amount of drugs that we ultimately were talking about in this case. So what follows from that? What follows from that shows that the depth and breadth of the search by the officers... Before the warrant. Before the warrant revealed that quantity of drugs and they are disingenuous in what they tell us. That was what the significance of that tape was. Before they're there with the warrant, or even before they get a phone call that a warrant was issued, the chief is on the phone with the mayor, talking about the same thing. And then, you know, this background, this background shows what's going on. It shows that they did what they did and then went back and fabricated the facts to suit their particular theory of the case. What time was the warrant issued? The warrant was issued at 735 or 737, you know, in the home of Judge Trudeau. And they first went in at what time? I can't hear you, Judge. I'm sorry, they first went in at what time? When they first went into the... You know, 2-18. They were at the location at 2-17. This is five hours later. Five hours later. And by that time, because Ms. Sanchez had a Latino name, they sent a Latino officer thinking she may have been speaking Spanish. But he's talking and interviewing her in her statement with specific inquiries about controlled substances and about guns. Guns. Now, what's the significance of that? The significance of that is Lieutenant Templowski says, I never saw a gun until I went into the black bag. After. He says, I don't go into the black bag until the warrant is there. Specific inquiry is made about guns at 6 o'clock. So, I mean, that shows you what's going on. That they tossed that room. They completely went through that room with the search and then go back and say, we're now going to get a warrant. You haven't convinced me, at least you haven't made much of a point, that whatever the appropriateness of the charge based on what they found in the hotel room, that we would have to reverse on the drugs and the gun from the car. Because the father gave consent to search the car. I cannot contest that. And it becomes a jury question. However, what happens there with regard to the use of the gun to further the distribution, the record is completely devoid. Well, there are lots of cases, I think, and I don't think Justice Souter's decision this week affects that, that say that a gun near a substantial amount, enough drugs to warrant, to make the inference of intent to distribute, a gun near that is in furtherance. Because his decision is on use. There's 10 bags. There's not a kilogram. Well, I don't know. But 10 bags? I mean, 10 bags are not for personal use. 10 bags are for personal use. Someone can snort 10 bags in a day. Maybe you know that. I don't know that. Well, we'll take you down that, Judge. No, thank you. Okay. All right, thank you both very much. We'll take it under advisement. Thank you.